UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Teresa A. Jeter, | ) | Civil Action No.  5:15-4562-PMD-KDW |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | OF MAGISTRATE JUDGE |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.      Relevant Background

A.      Procedural History

On January 4, 2012, Plaintiff protectively filed for DIB under Title II of the Act, 42 U.S.C. §§ 401-433, alleging she became disabled on December 3, 2011. Tr. 124-25. After being denied initially, Tr. 87, and upon reconsideration, Tr. 97, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 119-20. The ALJ conducted a hearing on September 4, 2013, taking testimony from Plaintiff and Vocational Expert ("VE") Leanna Hollenbeck. Tr. 26-55. Representing Plaintiff at that hearing was her attorney, Charles Edwards. Tr. 26. The ALJ denied Plaintiff's claim in a decision dated March 28, 2014. Tr. 9-21. Plaintiff requested review of this decision from the Appeals Council, Tr. 8, which denied her request on September 17,

2015, Tr. 1-6, making the ALJ's March 28, 2014 decision the Commissioner's final decision for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed November 11, 2015. ECF No. 1.

      B.  Plaintiff's Background and Relevant Medical History

          1.  Background

Plaintiff was born in December 1961 and was 49 years old as of her alleged onset date of December 3, 2011. Tr. 157. In her form Disability Report-Adult Plaintiff indicated she completed the ninth grade and her past relevant work ("PRW") included assistant manager in a convenience store, cashier/cook at a fast food chain and in a restaurant, kitchen aide in a nursing home, meat packager in a food processing company, and sorter/material cutter at textile plants via temporary agencies. Tr. 162. Plaintiff indicated she stopped working on June 6, 2011 when she was terminated for allowing a non-employee to empty the trash. Tr. 161. Plaintiff indicated that her conditions of high blood pressure, diabetes, Hepatitis C, trigger finger right thumb, and blurred vision became severe enough for her to stop working on December 3, 2011. *Id.* In a subsequent Disability Report-Appeal dated March 29, 2012, Plaintiff indicated her "hands have gotten worst (sic) my thumb on my right hand don't bend at all now, and my left hand the pain has gotten more severe and it swells, my left foot swells if I stand or walk too long and also has pain and is tender." Tr. 193. Plaintiff indicated that as a result she "can't use my hands like I use to. I drop things and my hands are weak. My left foot can't stand for a long period of time, my foot swells." *Id.* In a Disability Report-Appeal dated June 20, 2012, Plaintiff's counsel reported that the "Pain in both hands has gotten much worse in the last few months. She has trouble holding on to things. She has trouble dressing herself, combing hair, brushing teeth, and tying her shoes." Tr. 202. The Report also includes the following new condition: "She has been

diagnosed with authorities (sic) in her left knee and ankle. Her left leg swells almost daily and is very painful." Tr. 203.

### 2. Relevant Medical History

#### a. Matthew Fox, M.D.

On March 22, 2012, State agency consultant Matthew Fox, M.D. completed a Physical RFC Assessment of Plaintiff in conjunction with the disability determination denying Plaintiff's claim for DIB at the initial level. Tr. 91-93. Dr. Fox found that Plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, stand and/or walk for a total of six hours in an eight-hour day, sit for about six hours in an eight-hour workday, and was limited in both upper extremities for pushing and/or pulling. Tr. 92. Dr. Fox indicated Plaintiff had no postural limitations, but she had manipulative limitations that included limited handling and fingering (gross and fine manipulation). *Id.* He indicated Plaintiff had no manipulative limitations with regard to reaching in any direction or feeling. *Id.* Dr. Fox indicated Plaintiff should "limit bilat handling and fingering to freq 2nd to trigger thumbs." *Id.* Dr. Fox opined that Plaintiff had no visual, communicative, or environmental limitations. Tr. 92-93. As part of his additional explanation Dr. Fox concluded: "The claimant's reported limitations are partially credible. MDIs exist, but objective medical evidence does not support the severity of reported limitations. The claimant's MSK impairment is severe, but would not be expected to preclude work as described in this RFC." Tr. 93.

#### b. Adrian Corlette, M.D.

On May 1, 2012, State agency consultant Adrian Corlette, M.D. completed a Physical RFC Assessment of Plaintiff in conjunction with the disability determination denying Plaintiff's

claim for DIB at the reconsideration level. Tr. 102-04. Dr. Corlette's limitations were the same as Dr. Fox's. *Id.*

c.   Melanie Johnson-Bailey, M.D.

Almost two months after the administrative hearing on September 4, 2013, Dr. Johnson-Bailey conducted a Disability Examination of Plaintiff on October 26, 2013. Tr. 337-40. Plaintiff reported having knee and ankle problems, high blood pressure, diabetes mellitus, and hepatitis C. Tr. 337. Plaintiff noted that her last job was in June 2011; she can dress and feed herself; she can stand for 20 minutes, sit for 30 minutes, and walk on level ground for 30 minutes. Tr. 338. She reported being unable to lift anything, but she can drive a vehicle and the only chore she can do is sweeping. *Id.* On general examination Dr. Johnson-Bailey noted that Plaintiff's left ankle was "extremely TTP [tender to palpation] with edema" and measured 11.5 inches compared to her right ankle measurement of 9.5 inches. Tr. 339. Dr. Johnson-Bailey provided the following opinion regarding Plaintiff's functional limitations:

> The claimant had no functional limitations in regards to Knee and ankle problems, HBP, DM, Hep C.
> Back/neck/hands/knee/ankle pain: ROM [range of motion] testing wnl [with no limits]. There were no findings to indicate functional limitation.
> HBP: claimant reports uncontrolled BP, however, she had a normal BP and pulse on exam.
> Hep C: Chronic medical problem. There is no evidence of liver dysfunction and MRs do not indicate she has any symptoms due to Hep C.
> DM II – Not a cause of functional limitation.

Tr. 340.

On November 1, 2013, Dr. Johnson-Bailey completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical). Tr. 343-48. She indicated Plaintiff could continuously lift up to 10 pounds, and occasionally lift up to 100 pounds; continuously carry up to 10 pounds, occasionally carry 11 to 20 pounds, and never carry over 21 pounds. Tr. 343.  She

indicated Plaintiff could sit for one hour at one time without interruption with a total four hours in an eight-hour workday; stand for one hour without interruption with a total of three hours in an eight-hour workday; and walk for one hour uninterrupted with a total of one hour in an eight-hour workday. Tr. 344. Dr. Johnson-Bailey opined that Plaintiff could reach, handle, finger, feel, and push/pull continuously with her right and left hands; and she could operate foot controls continuously with both feet. Tr. 345. She indicated Plaintiff could frequently climb stairs and ramps; occasionally climb ladders or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. Tr. 346. Dr. Johnson-Bailey indicated Plaintiff had no hearing or visual impairments and could never tolerate exposure to unprotected heights; frequently tolerate exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, and vibrations; and could occasionally tolerate exposure to dust, odors, fumes and pulmonary irritants, extreme cold, and extreme heat. Tr. 347. Dr. Johnson-Bailey indicated Plaintiff could perform the following activities: shop; travel without a companion; ambulate without assistive devices; walk for a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, or use paper files. Tr. 348.

C.    Administrative Proceedings

On September 4, 2013, Plaintiff appeared with counsel at an administrative hearing and testified regarding her application for DIB. Tr. 26. VE Leanna Hallenbeck also appeared by telephone and testified at the hearing. Tr. 28.

1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified that she was 51 years old, single, lived in an apartment with a friend, completed the eighth grade and part of the ninth, did not

obtain a GED, and has not had any special job training. Tr. 31-32. Plaintiff also stated that she has a driver's license and was never in the military. Tr. 33. Plaintiff testified that she last worked on June 6, 2011, when she was terminated because she got sick and had a non-employee do her work of emptying the trash. Tr. 33-34. When asked what kept her from returning to work Plaintiff testified that she was "sickly a lot" from hepatitis and diabetes. Tr. 34. Plaintiff also testified that her hands "hurt all the time, constantly." *Id.* Plaintiff stated that when she was young she had surgery on her right leg and if she stands for a long period of time her leg swells and "gives out" on her. *Id.* Plaintiff also testified that she has arthritis in her right knee and so far has had one injection in her knee. *Id.* Plaintiff testified that she is being treated at St. Luke's free medical clinic for her leg problems and after one injection in her right knee they told her to take Advil or Ibuprofen for pain. *Id.* She stated that she was also given pain pills after the surgery on her thumb. Tr. 34-35. Plaintiff testified that four months ago she had x-rays done on her back because of pain in her neck and between her shoulder blades. Tr. 35. Plaintiff testified that she was told she "was having spasms from a previous surgery" but "to do any more surgery could cause [her] to be paralyzed or something so [her doctor] just gave [her] pain medicine for that, Tramadol." *Id.*

In response to questions from her counsel Plaintiff testified that initially the pain in her hands started in her thumbs "but now it's just my whole hands." Tr. 35. Plaintiff stated she was told she had osteoarthritis in both hands and trigger finger in both thumbs. *Id.* Plaintiff stated that she does not have to be doing anything with her hands for them to ache and "they throb all the time." Tr. 36. Plaintiff testified that her hands are weak and she drops things and "can't pick up things with [her] fingers." *Id.* Plaintiff testified that cortisone injections offer relief for a short period of time but because the pain always returns she was told she would need surgery. *Id.*

Plaintiff confirmed that three days prior to the hearing she had surgery on her right hand and when she was scheduled to return to the doctor on September 9th to have the stiches removed he was going to look at her left hand. *Id.* Plaintiff testified that because of not having full use of her hands she had a hard time getting dressed, using the bathroom, and doing her hair. *Id.* Plaintiff stated that her daughter helps her. *Id.* Plaintiff's counsel noted that Plaintiff had in the past done kitchen work and asked if she had any trouble with her hands in doing that work. *Id.* Plaintiff testified that she is unable to lift pots and pans and has "broken many plates." Tr. 37.

Plaintiff testified that she was hit by a car when she was six or seven years old and her left leg and ankle are "deformed from the surgery." Tr. 37. Plaintiff confirmed that she has a scar around her ankle and the bone protrudes out a bit but testified that "it's not painful all the time but it bothers me when I'm standing or walking and then it gives out on me." *Id.* Plaintiff testified that she has hepatitis C and that since she stopped working and her health insurance was terminated on December 31, 2011, she has been unable to get treatment for her liver. Tr. 38. Plaintiff testified that the hepatitis "causes [her] to feel nauseated and sickly all the time and sometimes when [she] eat[s] something [she] get[s] sick." *Id.* Plaintiff testified that when she asked the person to help her take the trash out at work it was because she "was sick and [her] hands were bothering [her]." Tr. 39. Plaintiff confirmed that she had neck surgery in 2003 and as a result she "can move it but [she] can't turn it so far . . . because it hurts and especially here recently . . . the pain has just gotten worse . . . ." Tr. 39-40. Plaintiff also confirmed that she had an injection in her knee in July 2012 that "helped it for a little while but it still hurts . . . ." Tr. 40. Plaintiff testified that she takes medication for her diabetes and her weight fluctuates but she is unsure if it is because of the diabetes or because of her liver. *Id.* Plaintiff stated her current weight was 182 pounds, down from 200 pounds. *Id.* Plaintiff stated that although she was

terminated in June of 2011 she listed her onset date as December 2011 because she tried to find work after she was fired and drew unemployment compensation for a little while. Tr. 40-41. Plaintiff testified that she was going to attempt to obtain her GED but her eyes started bothering her and she "couldn't see and I was just getting so sickly and sickly and I found out I had the diabetes." Tr. 41. Plaintiff testified that should stand without having trouble for "[m]aybe [an] hour, 30 minutes." *Id.* Plaintiff stated that she always walks with a limp due to surgery on her leg and if she walks longer than "maybe 30 minutes it will start hurting." *Id.*

In response to follow-up questions from the ALJ Plaintiff testified that she owns a car but does not drive often. Tr. 42. Plaintiff stated that either her daughter or granddaughter will drive her. *Id.* Plaintiff testified that she goes grocery shopping with her daughter, and she is able to load and unload light items from the dishwasher. *Id.* Plaintiff stated that her daughter "lives around the corner" and she helps "with a whole lot of things" and does the laundry. *Id.* Plaintiff testified that she also has a brother that lives in the same apartment complex who comes and helps her. Tr. 43. Plaintiff testified that on a typical day she does not "do anything but sit at home." *Id.* She stated that her daughter will take her "riding or something" and she has a female friend who comes to visit or will take Plaintiff to her house. *Id.* Plaintiff testified that she attends church every Sunday but does not attend any meetings. *Id.* Plaintiff testified that during the day she will "watch T.V. or look outside or sit outside and look at the cars go by and see what's going on. Other than that I don't do anything." *Id.* Plaintiff testified that she was not having any problems sitting. Tr. 45. Plaintiff testified that she did not know how long her hands were "going to be out of commission." *Id.* Plaintiff stated she did not know if she would need physical therapy until she was told by the doctor. *Id.* Plaintiff confirmed that she has been taking insulin since being diagnosed with diabetes. Tr. 46.

2.      VE Testimony

Before beginning her testimony the VE clarified with Plaintiff that her work as a cook in

2002 and 2003 was as a kitchen helper. Tr. 47-48. The VE identified Plaintiff's PRW as follows:

> [S]he worked at a convenience store and that would be called a cashier, checker. That's a semiskilled, light job. She indicated it was medium as performed. The DOT, the SVP is 3. DOT code is 211.462-014. She worked as a fast foods worker. That's an unskilled, light job. She indicated in the record that she performed it in the medium category. The DOT code is 311.472-010. She worked as a kitchen helper, an unskilled, medium job. She indicated it was light but I think I would keep it at medium. She worked at a variety of places. I suspect some of them would have been in the medium category. The DOT code is 318.687-010 and then worked she said off and on from 2001 to 2002 as a material cutter in the textile industry. That's an unskilled, light job. She indicated she performed it in the medium category. The SVP is 1. The DOT code is 789.687-150 and that's all the jobs that I saw.

Tr. 48. The ALJ asked the VE to assume someone of the same age, education, and PRW as

Plaintiff who is able to perform a restricted range of light work. Tr. 49. The ALJ noted that the

"individual is limited to no repetitive use of the neck or movement of the neck. She can

occasionally climb ramps or stairs but never climb ladders, ropes or scaffolds or balance on

slippery or moving surfaces. She could only occasionally stoop, kneel or crouch and never crawl.

In addition, she would be limited in the use of her hands to frequent gross and fine manipulation.

She must avoid exposure to extreme cold and extreme heat." *Id.* The ALJ asked if that person

would be able perform the jobs the VE described. After the ALJ clarified for the VE that no

repetitive neck use meant "no repetitive rotation, flexion or extension of the neck" the VE

responded that the limitations "would eliminate all the jobs because I think working in the

kitchen or as a fast food worker or as a cashier would require all those motions of the neck." *Id.*

The VE testified that she did not know if all jobs would be ruled out with that hypothetical

because "there would be some assembly jobs that would require the person to look forward and a

bit down." *Id.* The VE identified the following jobs that could be performed:

[N]ut and bold assembler where the person is putting fasteners in bags. There's not a lot of movement at the head while they're sitting there doing their work. It's an unskilled light job with an SVP of 2. The DOT code is 929.587-010. There are approximately 750 in [South] Carolina, 50,000 nationally. . . .parking lot cashier, the person is normally sitting on a swivel stool so they would not have to turn the neck when turning to see the person, the driver coming up for payment and it's an unskilled, light job. The DOT is 211.462-010. There are approximately 750 in South Carolina, 126,000 nationally. There would be ticket seller, an unskilled, light job with an SVP of 2. The DOT code is 211.467-030. There are approximately 1,000 in South Carolina, 60,000 nationally.

Tr. 50. The ALJ asked if there would be skills from her previous work that would transfer to a sedentary range of work. The VE responded in the negative, noting that "the only semiskilled job she had was cashier, checker and skills do not transfer to a sedentary job." *Id.*

The ALJ asked the VE if there would be any jobs available if she were to assume the individual could not sustain sufficient concentration, persistence or pace to do even simple, routine tasks on a regular and continuing basis for eight hours a day, five days a week for a 40 hour work week or equivalent work schedule. Tr. 51. The VE responded the person could not maintain work in that case. *Id.* The ALJ asked how many absences employers typically allowed their employees each month and the VE responded "on an average less than one a month." *Id.* The ALJ asked how many routine rest or break periods employers customarily allowed their employees each day. The VE responded "[t]hree every two hours, the first one would be 10 to 20 minutes, the meal break after the next two hours would be 20 to 45 minutes and then after another two hours it would be approximately 10 to 20 minutes." *Id.* The ALJ asked the VE if the jobs she described earlier would be eliminated "if a person exceeded these customary limits on a regular basis, had to be absent one or more days a month or needed more frequent rest breaks or longer rest breaks" and the VE responded that "if it happened on a consistent basis over a few months" the person would lose their job or would not be able to get a job. Tr. 51-52.

Plaintiff's counsel asked the VE if the assembly line jobs would be "sitting jobs" and the VE responded that the "jobs are considered light because they're done at a bench height table with a stool available so the person can stand or sit." Tr. 52. Counsel asked if the position of parking lot cashier was for "for all parking lot attendants or would they just be the type that are staying in a booth all day long?" *Id.* The VE responded they are for all parking lot attendants. *Id.* The VE also noted that the position of ticket seller would be inside a booth. Tr. 52-53. Counsel noted that "there are usually a number of people out there looking for these jobs" and the VE agreed that she did not think absences would be tolerated very long and there are "abundant people" who could fill the jobs. Tr. 53.

In closing remarks Plaintiff's counsel noted that Plaintiff "has worked most all of her life and on initial application and on reconsideration there was a limited amount of medical produced." Tr. 53. Counsel stated that examiners did not have the benefit of all of the medical records that have since been produced including Plaintiff's 2003 neck surgery, the ankle development, and other issues that Plaintiff had before her initial application that she did not include. *Id.* Counsel noted that Plaintiff has a limited education, unskilled background, is approaching advanced age, and has "significant diseases" besides the orthopedic trouble that includes diabetes, hepatitis, and controlled hypertension. Tr. 53-54.

II.    Discussion

    A.    The ALJ's Findings

In her March 28, 2014 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since December 3, 2011, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.      The claimant has the following severe impairments: bilateral trigger thumbs with release, arthritis of the hands, and degenerative disc disease of the cervical spine with history of discectomy and fusion at C4-C5 (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: occasional climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional stooping, kneeling, and crouching; no crawling; no balancing on slippery or moving surfaces; no repetitive motion of the neck; and frequent fine and gross manipulation. The claimant should avoid all exposure to extreme heat and cold.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on December 24, 1961 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

> 11.    The claimant has not been under a disability, as defined in
> the Social Security Act, from December 3, 2011, through the date
> of this decision (20 CFR. 404.1520(g)).

Tr. 14-20.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series of five

sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing

considerations and noting "need for efficiency" in considering disability claims).  An examiner

must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a

severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[1] (4) whether such impairment prevents claimant from performing PRW; and (5)

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or
"Listed impairments") the Agency considers disabling without the need to assess whether there
are any jobs a claimant could do. The Agency considers the listed impairments, found at 20
C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R.
§ 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the
listed impairments for at least one year, he will be found disabled without further assessment. 20
C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish

whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

---

that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.      Analysis

Plaintiff alleges that the ALJ: (1) failed to provide an adequate discussion of her RFC and (2) failed to perform the necessary function-by-function assessment. Pl.'s Br. 2, ECF No. 15. The

---

impairment is disabling at Step 3).

Commissioner submits that "substantial evidence supports the ALJ's RFC assessment, which accounts for all of Plaintiff's credibly established functional limitations." Def.'s Br. 12, ECF No. 17.

      1.    ALJ's RFC Assessment

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4).

Here, the ALJ made the following RFC assessment regarding Plaintiff:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: occasional climbing ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional stooping, kneeling, and crouching; no crawling; no balancing on slippery or moving surfaces; no repetitive motion of the neck; and frequent fine and gross manipulation. The claimant should avoid all exposure to extreme heat and cold.

Tr. 15. The ALJ stated that in making this finding she considered Plaintiff's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." Tr. 16. The ALJ stated that she also considered opinion evidence, Tr. 16, and noted that "lacking functional evaluations or opinions from treating sources, the reports and conclusions from the consultative and non-examining sources are afforded appropriate weight." Tr. 18. The ALJ considered the October 2013 opinion of Dr. Johnson-Bailey who completed a consultative orthopedic examination of Plaintiff, and the State

agency consultants who in 2012 provided RFC assessments of Plaintiff's claims at the initial and reconsideration levels.[2] Tr. 19.

Plaintiff argues that the opinion evidence supports a finding that she is "limited to sedentary work at best and the ALJ failed to provide an adequate explanation otherwise." Pl.'s Br. 18. Plaintiff asserts that because the State agency consultants' opinions were made prior to other medical treatment "these opinions could not have been given weight if they were formed in ignorance of critical parts of the medical record." *Id.* Plaintiff also contends the ALJ rejected Dr. Johnson-Bailey's opinion as too restrictive "but gave no reason, beyond some unspecified 'objective medical evidence of record' to reject that opinion[.]" *Id.* at 19. The Commissioner argues that the medical opinions support the ALJ's RFC assessment but notes that "the ALJ gave Plaintiff the benefit of the doubt" and found Plaintiff more limited than the State agency consultants and Dr. Johnson-Bailey by reducing Plaintiff's RFC to light work. Def.'s Br. 14.

Before considering the opinion evidence the ALJ discussed the medical records related to treatment and/or surgery for Plaintiff's trigger thumbs, tendonitis and arthritis in her hands, neck pain, back pain, bilateral hand pain, knee pain, ankle pain and swelling, and degenerative disc disease. Tr. 17. The ALJ noted that "[t]here is no evidence in the record to support the claimant's allegations of any symptoms or functional limitations post-surgery. The claimant's physical examinations appeared essentially normal throughout the records, which is supported by the consultative physical examination on October 26, 2013. The claimant had normal range of motion in her neck, back, and all joints of all extremities. Straight leg raising test was negative bilaterally in both sitting and supine positions." *Id.* The ALJ also considered medical records indicating Plaintiff is obese. *Id.* The ALJ noted that she "considered the claimant's obesity in

---

[2] These opinions are set forth in the Background section of this Report.

accordance with SSR 02-1pp and has taken into account any cumulative effect of the claimant's obesity upon her alleged impairments by limiting the claimant to light work with additional postural and environmental limitations." Tr. 17-18.

> The ALJ discussed the opinion of Dr. Johnson-Bailey and concluded:
>
> This opinion is well supported by objective diagnostic testing and Dr. Johnson-Bailey's trained observations, her impartial analysis of the evidence of record, and a well-reasoned conclusion. The opinion is consistent with the claimant's treatment history, imaging reports, and physical examinations findings. However, the undersigned finds that the objective medical evidence of record supports a finding that the claimant is limited to light work; therefore, this opinion has been given moderate weight.

Tr. 19. As to the opinions of the State agency medical consultants, the ALJ determined their "opinions appear to be well reasoned and consistent with the medical evidence of record." *Id.*

The ALJ noted the following:

> The State agency medical consultants provided specific reasons for their opinions about the claimant's residual functional capacity: these opinions are grounded in the evidence of record, including careful consideration of the objective medical evidence and the claimant's allegations regarding symptoms and limitations. These opinions are consistent with the claimant's treatment history, imaging reports, physical examinations findings, and consultative examination report. However, the undersigned finds that the objective medical evidence of record supports that the claimant is limited to light work; therefore, these opinions have been given only moderate weight.

*Id.*

> Social Security Ruling 96-8p provides:
>
> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

1996 WL 374184, at *7. In a recent Fourth Circuit Court of Appeals decision, *Monroe v. Colvin*, 826 F.3d 176 (4th Cir. 2016), the court determined the ALJ's analysis of the opinion evidence was "incomplete and preclude[ed] meaningful review" because the "ALJ did not specify what 'objective evidence' or what aspects of [the claimant's] 'treatment history' he was referring to." *Id.* at 191. Citing the ALJ's "conclusory analysis" of the opinions of the consultative examiners and of the State agency consultants the court found that "[w]ithout more specific explanation of the ALJ's reasons for the differing weights he assigned various medical opinions, neither we nor the district court can undertake meaningful substantial-evidence review." *Id.*

Here, the ALJ's narrative is lacking in that it does not "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. First the ALJ finds the opinion evidence is consistent with the objective medical evidence, i.e., Plaintiff's treatment history, imaging reports, and physical examination findings. Then, inexplicably, the ALJ states the objective medical evidence does not support the findings of these physicians. Without further explanation the undersigned is unable to ascertain what part of the objective evidence is inconsistent and would therefore call for a lesser weight being given to the opinions. Because of this ambiguity the undersigned cannot determine if substantial evidence supports the ALJ's RFC assessment and recommends remand on this issue.

### 2.     Function-by-Function Assessment

Plaintiff asserts that the "ALJ failed to perform the necessary function-by-function assessment." Pl.'s Br. 21. The Commissioner contends that a formalistic factor-by-factor recitation of the evidence is unnecessary and "the ALJ discussed in detail Plaintiff's impairments

and the functional limitations they caused, and included those limitations in the RFC assessment." Def.'s Br. 16.

The Administration's policy interpretation on assessing an individual's RFC emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. The functions identified in the cited regulation include: physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. §404.1545(b)-(d). In *Mascio v. Colvin*, the Fourth Circuit addressed whether an ALJ's failure to perform a function-by-function assessment necessitates remand. *Mascio v. Colvin*, 780 F.3d 632, 636-37 (4th Cir. 2015). The court held that "a per se rule [requiring remand] is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Id.* at 636. However, the court "agree[d] with the Second Circuit that '[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Id.*

Here, at Steps Two and Three of the sequential evaluation process, the ALJ identified Plaintiff's impairments, considered her symptoms, and discussed her physical abilities. Tr. 14-17. With regard to Plaintiff's identified severe impairments of bilateral trigger thumbs with release, arthritis of the hands, and degenerative disc disease of the cervical spine with history of discectomy and fusion at C4-C5, the ALJ noted these impairments "have more than a slight effect on the claimant's ability to perform basic work activities." Tr. 14. As for Plaintiff's non-

severe impairments of hypertension, hepatitis C, diabetes, and remote history of left ankle injury with swelling, the ALJ determined there is "no objective medical evidence of record showing any significant functional limitations due to these impairments." Tr. 15. In her RFC assessment the ALJ outlined additional limitations on Plaintiff's ability to perform light work as defined in the regulations. The ALJ then continues her discussion of Plaintiff's RFC and describes Plaintiff's symptoms and impairments, both as testified to by Plaintiff and as described in the medical records, including Plaintiff's testimony about her daily activities. Although the ALJ's analysis of the evidence seems to provide a logical bridge between the evidence and her RFC findings, because of the ambiguity in the ALJ's consideration of the opinion evidence as it relates to the objective medical evidence, the undersigned is unable to state definitively that substantial evidence supports the ALJ's assessment of functionality. In addition to the undersigned's recommendation that the ALJ provide further explanation regarding her weighing of the opinion evidence, she should also revisit her analysis of Plaintiff's functional limitations.

III.     Conclusion and Recommendation

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as discussed within.

IT IS SO RECOMMENDED.

December 14, 2016                                  Kaymani D. West
Florence, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**